**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**     ) | |
| ) | |
| **v.**     ) | |
| ) | **Case No. 1:18 CR 355** |
| **HARES FAKOOR,**     ) | |
| ) | |
| **Defendant**     ) | |
| _____) | |

## SENTENCING POSITION

COMES NOW, the defendant, Hares Fakoor, and in accordance with 18 U.S.C. Section 3553(a) and Section 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing.  Although we believe this sentence is excessive, we respectfully request a sentence of 60 months—the mandatory minimum in this case.  In further support of his position, Mr. Fakoor offers the following:

### I.       PSR Objections

#### A.  Criminal History Category

We submit that a category II criminal history overstates the serious of the defendant's criminal history.  The defendant has one misdemeanor DUI conviction, which resulted from his alcoholism, and a second conviction from 2006 involving apparent masturbation in his car, in which the defendant tried to avoid being seen and was not deliberately exposing himself to anyone.  The commentary to the guidelines expressly provides that where the criminal history involves misdemeanors, and conduct is occurring nearly 10 years from the date of offense, it constitutes a circumstance that overstates the seriousness of the defendant's criminal history.  *See*

1

U.S.S.G. § 4A1.3 cmt. 3.   Given the defendant's DUI being the result of his alcoholism (which was a form of self-medication for his various mental health issues), and that the masturbation incident inside his car 12 years ago was not intended to be witnessed by anyone, we submit that the criminal history here does not deserve an enhancement and request under the commentary note that the Court reduce the criminal history to category I.

### B.  Guideline Range Conclusion

As such, we believe the appropriate guideline range should be a Category I criminal history, producing a guideline range of 97-121 months.

## II.     3553(a) Factors

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, require district courts to consider both the U.S.S.G. range and all of the factors contained in 18 U.S.C. Section 3553(a) when calculating a criminal defendant's ultimate sentence. District courts are instructed first to correctly calculate the guideline range and then consider the factors in Section 3553(a) to determine an appropriate sentence.

### 1.  Avoiding Unwarranted Sentencing Disparities

A sentence of 5 years is necessary to avoid unwarranted sentencing disparities, both in connection with the average defendant, and especially in connection with a defendant with autism and related mental health issues.  For an ordinary defendant, the following sentences should be considered: *United States v. Rocco*, 1:17 cr 20 (AJT) (36 month sentence on low end guidelines of 97 months, where defendant was previously arrested on child pornography charges in 2011, which resolved by Alford plea, and then accrued new child pornography charges a few years later); *United States v. Schnittker*, 1:14 cr 86 (AJT) (66 month sentence on low end guidelines of 135 month where defendant proceeded to trial and was convicted); *United States v.*

2

*Wells*, 1:15 cr 187 (AJT) (12 month sentence on low end guidelines of 51 months); *United States v. Shah*, 1:14 cr 282 (AJT) (mandatory minimum 60 month sentence on guidelines of 97-121 months); *United States v. Jaghori*, 1:13 cr 451 (AJT) (72 month sentence on child pornography production guidelines of 210-240 months);

These results suggest that the mandatory minimum sentence of 60 months might be appropriate in the absence of mitigating mental health concerns.[1]  However, where an autism

---

[1] We know from prior cases that this Court has read and is very familiar with the voluminous literature regarding the many problems with the child pornography guidelines.  To briefly summarize, and as set forth in *United States v. D.M.*, 942 F. Supp. 2d, 347-352: "The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country. *See, e.g.*, *United States v. Pulsifer*, 469 Fed.Appx. 41, 44 (2d Cir.2012) (describing the "unusually harsh impact of the child pornography Guidelines"); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir.2009) (expressing the "view that thesentencing guidelines [for child pornography] are in our judgment harsher than necessary"); *United States v. Henderson* ,649 F.3d 955, 964 (9th Cir.2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child pornography Guidelines). . .At their inception, in 1987, the Guidelines for child pornography covered only the crimes of transporting, receiving, and trafficking offenses. See C.R.,792 F.Supp.2d at 478. Possession of child pornography was not then a federal crime. Id.But, as Harvard Law School professor Carol S. Streiker has recognized: [T]he treatment of child pornography has been a one-way ratchet, repeatedly turned by Congress. In a little more than two decades, the child pornography Guidelines were substantively revised nine times, with each revision either extending the scope of the offense or making the penalty harsher. In the span of a single decade (from 1997 to 2007), the mean sentence of child pornography offenders increasedfrom 20.59–months to 91.30–months confinement—an increase of 443%. . . .The Court of Appeals for the First, Second, Third and Ninth Circuits—as well as district courts—have expressly recognized what little deference the child pornography Guidelines are owed. See *Dorvee*, 616 F.3d at 188; *Henderson*, 649 F.3d at 960 (holding that "district judges must enjoy the same liberty to depart from [the child pornography guideline] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in Kimbrough); *United States v. Grober*,624 F.3d 592, 609 (3d Cir.2010) (affirming district court's decision based on policy disagreement not to apply recommended Guidelines range for child pornography offense); Stone,575 F.3d at 93 (recognizingdistrict court's authority to vary from child pornography Guidelines); Munoz,2012 WL 5351750, at *4 n. 2 (citing cases); see also *United States v. Huffstatler*,571 F.3d 620, 623 (7th Cir.2009) (per curiam) ("[W]hile district courts perhaps have the freedom to sentence below the child-pornography guidelines based on disagreement with the guidelines, as with the crack guidelines, they are certainly not required to do so."). . . .Widespread criticism from the judiciary and others supports the Sentencing Commission's recent proclamation that it "concurs with the many stakeholders who contend that the sentencing scheme should be revisedto better reflect both technological changes in offense conduct and emerging social science research and also better accountfor the variations in offenders' culpability and their sexual dangerousness." Comm'n Rep. on Fed. Child Pornography Offenses 15 (emphasis added). Action must be taken, argues the Commission, to ensure that the Guidelines more rationally "account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purpose of punishment by accounting for the variations in offenders' culpability and sexual dangerousness." Id.at xvii." *See also, e.g.* Jelani Jefferson Exum, What's Happening with Child Pornography Sentencing?,24 Fed. Sent'g Rep. 85, 89 (2011) ("growing consensus among district court judges and the broader legal community that federal sentences for possession of child pornography are too harsh"); U.S. Sent'g Comm., Results of Survey of U.S. Dist. Judges, Jan. 2010 throughMar. 2010, Question 8 (June 2010) (finding that 70% of United States District Judges believe Guideline range for child pornography possession is too high and 69% of United States District Judges believe range for child pornography receipt is too high).

figures into the culpability calculus, the sentencing results are generally far less severe.  We note in this Courthouse, in *United States v. Boccardo* 1:17cr121 (GBL), which involved a high functioning autistic defendant who was able to obtain a masters in computer science, the Court gave a sentence of 2 years probation on a child pornography case, in view of the impact of his autism on his culpability.  And in *United States v. Smith*, 1:15 cr 42 (TSE), the initial sentencing guidelines on a production offense recommended 30 years low end, and Judge Ellis ultimately sentenced this autistic defendant to 2.5 years incarceration.[2]  Outside of this district, the results have been comparable in other autism cases, with many results even avoiding charges that carry sex registration.  *See* Exhibit B.  In view of the defendant's mental health history, we believe a sentence of 0-2 years would avoid unwarranted sentencing disparities, but in this case, the Court's hands are tied, and it cannot impose a sentence that is compliant with 3553(a).

### 2.  Background of the Defendant

As set forth on pages 4-5 of Dr. Bartlett's report,[3] the defendant was abused in varying ways from an early age, and the remainder of the report discusses the defendant's autism history, the impact it had on his development, and its relationship to the current offense.   The report summarizes its findings on pages 12-14:

> Hares Fakoor presents as an intelligent, yet socially vulnerable man with a complex psychological profile, to include an Autism Spectrum Disorder (ASD), a historically identified diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD), a recurrent and severe Major Depressive Disorder, a reported physical and sexual trauma history, and an Alcohol Use Disorder . By all 13 available accounts, Mr. Fakoor has presented with symptoms of an Autism Spectrum Disorder since early childhood , including difficulty connecting with peers and "fitting in," difficulty carrying on 14 reciprocal conversations with others or initiating social contact, even with family, and irrational outbursts of anger in response to triggers such as changes in plans or new situations. He reports that he was frequently picked on by other children, and his mother admits

---

[2] *See* Exhibit A.
[3] *See* Exhibit C.

that he struggled socially. Mr. Fakoor states that his mother worried that he was "crazy or not normal" because he was "extremely detached socially." He admits that he often struggled to understand the perspective of others.  He 15 also admits that has been hyper-sensitive to some sensory input, and hypo-sensitive to others.

As is common for individuals with ASD, Mr. Fakoor also describes a history of problems in executive functioning , including difficulty with distractibility and impulsivity, and reports that he 16 17 was diagnosed with ADHD and previously prescribed both Ritalin and Adderall by a primary care physician. He states that he took the medication for a short period of time, but not consistently. Also common for individuals with untreated ASD, Mr. Fakoor and his mother describe him having a history of significant depression, including periods of suicidal thinking. While the depression may stem, in part, from the significant challenges that Mr. Fakoor experiences in social functioning, the vegetative symptoms of depression also further decrease Mr. Fakoor's motivation to engage socially. By Mr. Fakoor's report, he began drinking alcohol as an adolescent, which appears to have served him by lowering his inhibitions in social situations. However, he appears to have developed an alcohol use disorder, which has been more pronounced at various times, including in times of significant stress.
. . .
In short, the social and emotional deficits associated with Autism that have been exhibited by Mr. Fakoor for over two decades (see above), along with impairments in judgment due to his deficits in executive functioning, his chronically depressed psychological state, and alcohol abuse, contributed to his pursuit of gratification and decreased "boredom" through the consumption of extreme forms of pornography that eventually escalated to imagery depicting the sexual exploitation of children. Notably, Mr. Fakoor has never been charged with a contact sexual offense and denies being sexually attracted to children.

Although Mr. Fakoor may be sentenced to a period of incarceration, available information suggests that the majority of child pornography-only offenders (i.e., no known history of contact offenses) present with low risk for recidivism . Notably, Mr. Fakoor has not yet received adequate mental 18 health or substance abuse treatment to address his symptoms of ASD, ADHD, depression, or alcohol abuse. Given that all of these conditions are dynamic factors , treatment to address these factors is 19 likely to improve Mr. Fakoor's mood, his coping ability, and his positive social network, thereby decreasing his already low risk of recidivism.

As shown above in our analysis of other sentencing results in these cases, this Court is not writing on a blank slate with respect to the intersection of autism and its impact on the

culpability of child pornography offenders.   The available literature shows that those suffering from ASD "are characterized by marked and enduring impairments within the domains of social interaction, communication, play and imagination, and a restricted range of behaviors or interests."[4] "Autism spectrum disorders are considered to be the result of a neurological disorder that affects the functioning of the brain," and not a social pathology.[5] As the term "spectrum" indicates, "ASD refers to a group of syndromes falling along a continuum of severity hallmarked by deficits in social interaction."[6] Psychologists diagnose ASD based on behavioral characteristics in three areas: 1) qualitative impairments in social skills, 2) qualitative impairments in communication, and 3) ritualistic, repetitive activities and interests, and hyper- and hyposensitivity to sensory stimuli like light, noise, touch, tastes, food textured, surfaces, clothing, and so on.[7] Symptoms of ASD vary from individual to individual, from "very severe (Kanner type) to "high functioning" (Asperger type)." [8]  Though sometimes Asperger's has been described as a "mild" form of autism, this is an imperfectly relative term, because the impairments in this form of autism can be serious and debilitating.

### Overview of Asperger's Syndrome

Two-thirds to three-quarters of ASD are "High-Functioning." This is often denoted as "hfASD." This includes 1) High-Functioning Autism and 2) Asperger's Syndrome. AS is a

---

[4] Klin, Ami, James McPartland, and Fred R. Volkmar, "Asperger Syndrome." Handbook of Autism & Pervasive Development Disorders, 3rd Edition. Vol. 1: Diagnosis, Development, Neurobiology, & Behavior. Eds. Fred R. Volkmar, Rhea Paul, Ami Klin, and Donald Cohen. New York: Wiley, Anthony & Sons, Inc. (2005), 88-124, at 88.
[5] Sicile-Kira, Chantal. Adolescents on The Autism Spectrum: A Parent's Guide to The Cognitive, Social, Physical, And Transition Needs of Teenagers with Autism Spectrum Disorders. New York: Penguin Group (2006), at 7.
[6] McPartland, James and Ami Klin, "Asperger's Syndrome." 17 ADOLES MED 771-778, 771 (2006).
[7] Bruey, Carolyn Thorwarth. DEMYSTIFYING AUTISM SPECTRUM DISORDERS: A GUIDE TO DIAGNOSIS FOR PARENTS AND PROFESSIONALS. Bethesda, Maryland: Woodbine House (2004), at 49.
[8] Sicile-Kira, note 27, at 7.

neurobiological "brain-based" disorder,[9] characterized by social isolation, odd and pedantic speech, poor nonverbal communication, and preoccupation with certain idiosyncratic interests.[10] AS differs from autism in its relatively better preserved verbal skills but relatively worse motor development.[11] At the time it was included in the Diagnostic and Statistical Manual of Mental Disorders (DSM) in 1994, AS was not well known.[12] As noted, the most recent revision of the DSM has dropped the use of Asperger's, and the other distinct conditions, in favor of an encompassing diagnosis of ASD. Suffice to say that the nomenclature remains useful in describing a particular section of the "autism spectrum" with commonly understood features and consequences.

In 1994 physicians and psychiatrists were unsure of AS' prevalence in the general population, the male/female ratio, or the exact genetic and "environmental" (considered broadly) links increasing the likelihood of finding similar conditions in family members.[13] Scientific research and service provision for individuals with AS was still in its infancy.[14] In the past two decades, however, our understanding of the condition has improved significantly.

### Typical AS Behaviors

A child with AS usually is of normal or above-normal intelligence,[15] and he may have few easily observable symptoms, and may have experienced little or no difficulty developing language at the normal age.[16]

---

[9] Tantam, D. "The Challenge of Adolescents and Adults with Asperger Syndrome." 12 CHILD ADOLESCENT PSYCHIATRY CLINIC OF NORTH AMERICA 143 (2003), at 147.
[10] Klin, McPartland, and Volkmar, supra, at 89.
[11] Id.
[12] Klin, Ami and Fred R. Volkmar, "Asperger's Syndrome: Guidelines for Assessment and Diagnosis." LEARNING DISABILITIES ASSOCIATION OF AMERICA (Pittsburgh: June 1995).
[13] Id.
[14] Id.
[15] Klin, McPartland, and Volkmar, supra, at 92.
[16] Id. at 98. See also Mesibov, et al., supra, at 9. On parallel with this is the Diagnostic and Statistical Manual of Mental Disorders definition of AS:

The commonly described clinical and diagnostic features of the syndrome include: 1) qualitative impairments in social interaction;[17]  2) failure to understand and appreciate proper, socially expected behavior and mores;[18] 3) pedantic and monotonic speech[19] but no clinically significant delay in language;[20] 4) intense absorption in circumscribed topics;[21] 5) clumsy and ill-coordinated movements and odd posture;[22] 6) no clinically significant delay in cognitive development;[23] and 7) the criteria for another ASD or Schizophrenia is not met.[24] Each of the first six symptoms or behaviors can contribute to the misinterpretation of the AS individual's conduct by strangers, or law enforcement officials.

---

The essential features of Asperger's Disorder are severe and sustained impairment in social interaction (Criterion A) and the development of restricted, repetitive patterns of behavior, interests, and activities (Criterion B). In contrast to Autistic Disorder, there are no clinically significant delays or deviance in language acquisition . . . although more subtle aspects of social communication (e.g., typical give-and-take in conversation) may be affected. . . . In contrast to Autistic Disorder, Mental Retardation is not usually observed in Asperger's Disorder.

In fact, "variability of cognitive functioning may be observed, often with strengths in non-verbal areas (e.g., visual-motor and visual-spatial skills)"

[17] Klin, McPartland, and Volkmar, supra, at 89. Difficulties in nonverbal and verbal communication impair AS individuals' abilities to have meaningful social interactions. There is a conspicuous lack of facial expressions or a reduction in diversity of expressions and limitations in the use of gesture and difficulties in understanding others' nonverbal cues. Verbal communication is characterized by "highly circumstantial utterances," "long-winded and incoherent verbal accounts failing to convey a clear message or thought," and "one-sidedness."

[18] Id. at 99. Individuals with AS exhibit marked difficulty in social circumstances where, as intelligent and high-functioning individuals, they are expected to naturally intuit social customs. Individuals with AS may react inappropriately to, or fail to interpret the valence of, the context of the affective interaction, often conveying a sense of insensitivity, formality, or disregard for the other person's emotional expressions. They may be able to describe correctly, in a cognitive and often formalistic fashion, other people's emotions, expected intentions, and social conventions; yet, they are unable to act on this knowledge in an intuitive and spontaneous fashion, thus losing the tempo of the interaction. Their poor intuition and lack of spontaneous adaptation are accompanied by marked reliance on formalistic rules of behavior and rigid social conventions. This representation is largely responsible for the impression of social naivete and behavioral rigidity that is so forcefully conveyed by these individuals.

[19] Id. at 89.

[20] AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS TEXT REVISION 568 (4th ed.2000), 299.80 [hereinafter DSM-IV-TR]. Asperger's Disorder. For instance, toddlers with AS use single non-echoed words by 2 years of age and spontaneous communicative by 3 years of age.

[21] Klin, McPartland, and Volkmar, supra, at 89. Individuals with AS tend to display "egocentric preoccupations with unusual and circumscribed interests that absorb most of the person's attention and energy, thus precluding the acquisition of practical skills necessary for self-help and social integration."

[22] Id.

[23] DSM-IV-TR, 299.80 Asperger's Disorder.

[24] Id. See also, People v. Youngerman, 838 N.E.2d 103, 105 (Ill. Ct. App. 2005).

### 1.  Qualitative impairments in social interaction (and consequent social isolation)

Several features fall within this category:

### A.  Difficulty understanding others' perspectives

Clinicians describe the AS individual as lacking in "empathy." By this they do not suggest that AS individuals are callous, sadistic or sociopathic. This feature is not reflective of a personality disorder. Asperger's is a "brain-based" disorder. "Lacking in empathy" is merely a reference to the fact that many individuals with AS have extreme difficulty viewing the world through the eyes of others. Some persons with AS "don't even notice when parents, siblings, or other children are hurt, sick, or sad. . . . or they may horribly misunderstand others' feelings."[25]

Research has shown that the AS individual simply does not see crucial social cues which neurotypical individuals depend on to assess and adapt to social situations.[26] These "cues" can be facial expressions, or physical gestures, or the reaction of other persons to what one person says or does, or things occurring in the "background."[27] The AS individual simply does not see these things, and, therefore, does not learn anything from them about how to respond to such cues. Indeed, one of the most typical features of AS, from the viewpoint of the casual observer, is that the individual is unlikely to look one "in the eye."

---

[25] Mesibov et al., supra, at 10. See also Klin, *supra*, at 89.

[26] Klin, Ami et al., "Defining and Quantifying the Social Phenotype in Autism." 59 AM J PSYCHIATRY 895 (June 2002), at 899.

[27] Dr. Ami Klin et al., studied the gaze patterns of moviegoers with AS and a control group of neuro-typical moviegoers. In close-up scenes, the AS individual focused entirely on the mouth and lower portion of the actor's face, whereas the neuro-typical viewer focused primarily on the eye region. The AS individual missed the scene's meaning which was exhibited in the actress's facial expression, particularly in her gaze. In Dr. Klin's study, the AS viewer seemed not to understand the inviting, flirtatious nature of the actors' interaction–or the impact of these behaviors on the third actor, who played the flirtatious woman's husband, in the back of the scene, since the AS viewers did not once glance at the action in the background. In contrast, the normal comparison viewer's visual scanning delineated a rather loaded social triangle. *Id.* at 900-902. Adequate interpretation of social situations also requires assessing others' reactions to the speaker to make sense of the social dynamics unfolding in the conversation. The AS individual, however, is unlikely to do so, resulting in a very partial, overly literal, or mistaken interpretation of a social situation. *Id.* at 900.

More recent research has confirmed that this aberrant movement of the eyes is a diagnostic tool that can be used to detect autism in infancy. As Dr. Klin has observed: "[T]he 'eye is the window to the other person's experiences' which we need to interpret in order to fit in to the world." This puts an empirical stamp on the concept that the individual with ASD simply does not "see" what others see, and misses the meaning and understanding that we "typical" persons glean from the thousands of social interactions that teach us how to behave in the world.

### B.  Mind Blindness

Taking another approach to this phenomenon, Barbara Haskins and J. Arturo Silva describe "Theory of Mind" ("ToM"), meaning the ability to "estimate the cognitive, perceptual, and affective life of others as well of the self."[28] AS individuals are severely disabled in this ability. People with AS "are unable to perceive other peoples' needs, desires or distress due to their inability to interpret correctly other people's behavior."[29] Haskins and Silva describe this deficit as "mind blindness."[30]

### C.  Lag in social and emotional development

AS children (most often boys) are years behind their non-AS peers in social and emotional development.[31] In fact:

> one team of experts contend that between the ages of nine and nineteen, a child with AS has the emotional maturity of someone two thirds his age. . . .

---

[28] Haskins, Barbara G. and J. Arturo Silva, "Asperger's Disorder and Criminal Behavior: Forensic-Psychiatric Considerations." 34 J AM ACAD PSYCHIATRY LAW 374 (2006), at 378. Klin et al., describe "theory of mind" as the individual's "ability to impute mental states such as beliefs, desires, and intentions to others and to themselves or to have a theory of other people's (and their own) subjectivity." Klin, Ami, James McPartland, and Fred R. Volkmar, supra, at 104. Although Klin et al., note the significant deficit in ToM skills in individuals with AS, the authors believe individuals with AS may improve their ToM skills through proper training: certain "cognitive characteristics provide individuals with AS with an advantage in that they may be able to succeed on ToM tasks by means of well-reasoned responses based on logical inference, rather than true social intuition."

[29] Katz and Zemishalny, *supra*, at 171-172

[30] Haskins and Silva, *supra* at 378.

[31] GALE ENCYCLOPEDIA OF NEUROLOGICAL DISORDERS. Eds. Stacey L. Chamberlin, Brigham Narins, and Rebecca Frey. Database updated November 2006.

> Compared to same-age peers, they may seem more naive, more emotionally volatile, and less in control of themselves.[32]

Many teens and young adults with AS still have obsessions or special interests in subjects or objects that are not appropriate for their age and reflect their immaturity, such as Sesame Street or Disney movies, security objects, and so on, resulting in increased social ostracization.[33]

### D. Painful cognizance of their difference

Typically, autistic persons are withdrawn and may seem to be unaware of, and disinterested in, other persons.[34] Individuals with AS, on the other hand, are often keen, sometimes painfully so, to relate to others, but lack the skills to successfully engage them.[35] Individuals with AS are often socially alienated and self-described "loners," though they have a great interest in making friendships and meeting people.[36] These wishes are invariably thwarted by their awkward approaches and unwitting insensitivity to other person's feelings, intentions, and nonliteral and implied communications (e.g., signs of boredom, haste to leave, and need for privacy).[37] As a result, AS individuals are often surprised, upset, and remorseful when told that their actions are hurtful or inappropriate.[38]

Many of the children and adults diagnosed with autism seem lost in their own world. They seem not to register pain or danger, as if they do not have sufficient sense of themselves to be able to be concerned about their own welfare or survival. In comparison, people with AS do not live in their own world so much as their own island, floating in a sea of humanity. They do

---

[32] Hendrick, Joanne and Patricia Weissman. THE WHOLE CHILD: DEVELOPMENTAL EDUCATION FOR THE EARLY YEARS, 8th Edition. New York: Prentice Hall (2005). *See also, United States v. Kamen*, 491 F. Supp. 2d 142, 146 (D. Mass. 2007).

[33] Sicile-Kira, *supra*, at 39.

[34] Klin, McPartland, and Volkmar, *supra*, at 99.

[35] *Id*.

[36] *Id*. See also, *Edwards v. State*, 200 S.W. 3d 500, 507 (Mo. 2006).

[37] Klin, McPartland, and Volkmar, *supra*, at 99. See also Klin, *supra*, at 9.

[38] Klin, *supra*, at 9.

have projects and plans for themselves, and, unlike their other more disordered counterparts, they do compare themselves with other people, often painfully.[39]

Not being an effective social agent is something that people with AS feel often, engendering a sense of social powerlessness. This is commonly a factor for AS individuals who find themselves in trouble at school or in the community.[40] Opportunistic peers often take advantage of vulnerable AS individuals' lack of social agency, combined with their inability to properly gauge others' intentions and trustworthiness, and either bully AS teens or convince them to take part in mischievous acts.[41]  Thus, life is already very difficult for AS individuals. Peers are much more judgmental than either older or younger people, and so adolescents, for whom peer relationships are paramount, face the greatest challenge in this respect.[42]

### 2.   Failure to Understand and Appreciate Socially Expected Behavior and Mores.

It is a diagnostic criterion for those with ASD that they do not appreciate social norms which others learn through years of reciprocal social interaction. This comes about by way of the ability to perceive the social world, and perceive the nonverbal social cues to which typically developed persons naturally exhibit and respond to nonverbal cues in social settings.

Because of its peculiar neurological configuration, the brains of those individuals with ASD do not process the numerous nonverbal social cues, where the cues in social scenes.  As a result, they cling to the words that are used which they interpret literally, in which these two very concrete thinking. Because of this, they fail to develop the kind of intuitive social thinking which most of us use for the vast majority of our mental operations during the day. Without that kind of intuitive social thinking those with ASD do not grasp or "appreciate these unwritten rules of

---

[39] Tantam, *supra*, at 145.
[40] *Id*. at 150.
[41] Hendrick and Weissman, *supra*, at 424.
[42] Tantam, *supra*, at 150.

social engagement."[43] "Everything that is not explicit, everything that is unstructured, everything that is not defined and expressly supported is a difficulty for individuals with Asperger Syndrome." Rather, their behavior may appear "inappropriate or embarrassing when, in addition to failing to use these social niceties, they violate clear social conventions," which often times results from an unawareness of other people's feelings or point of view.[44] They often engage in behavior that is completely alien to, and therefore usually misunderstood by, mainstream society which expects adolescents or young adults exhibiting normal intelligence and language abilities to "act their age."

For example, individuals with AS tend to answer questions very literally, which may be annoying, especially to police officers. They may express their opinions or facts without screening for other peoples' feelings, for social propriety, or for common sense.[45] Often they are so candid that they express thoughts that will actually work against them because they cannot appreciate the motivations of the person they are talking to. An AS individual may, without any ill will, exclaim that his neighbor's arms look like "fat sausages." Or they might stand outside a public restroom in a park at night or follow a woman walking down the street too closely, without any awareness of the social implications of this conduct.

Most important in this context, without being expressly told, which almost nobody ever is, individuals with ASD are not going to intuit social opprobrium, the harsh condemnation, for looking at sexual images of underage persons. Moreover, because their mind is so concrete, and does not concern itself with intentions emotions and feelings of people, or see, in objects, social or psychological implications, they are not going to intuit from sexual scenes involving children

---

[43] Mesibov et al., *supra* at 10.
[44] *Id.*
[45] Hendrick and Weissman, supra, at 425.

anything about the provenance of those images: why they were made, by whom they were made, and the feelings or emotions of those depicted.

### 3. Pedantic and Monotonic Speech but no Clinically Significant Delay in Language.

Most children with AS learn to form words at the usual age, using single words by two years of age and communicative phrases by three years of age.[46] Problems occur, instead, in the content and delivery of verbal communication.[47] Speech may be marked by poor prosody, without the range of intonation that tells the listener that "this is fact" or "this is serious" or "this is funny."[48] Speech may often be tangential and circumstantial, conveying a sense of looseness of associations and incoherence.[49] The lack of coherence and reciprocity in speech results in one-sided, egocentric conversational style (e.g., unrelenting monologues about the names, codes, and attributes of innumerable TV stations in the country), failure to provide the background for comments and to clearly demarcate changes in topic, and failure to suppress the vocal output accompanying internal thoughts.[50] The AS child or adult may talk incessantly, usually about their favorite subject, often in complete disregard to whether the listener might be interested, engaged, or attempting to interject a comment, or change the subject of conversation.[51] Despite such long-winded monologues, the individual may never come to a point or conclusion.[52] Attempts by the interlocutor to elaborate on issues of content or logic, or to shift the interchange to related topics are often unsuccessful.[53]

---

[46] DSM-IV-TR definition of AS.
[47] Klin, McPartland, and Volkmar, *supra*, at 99
[48] *Id*.
[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id*.
[53] *Id*.

### 4.   Intense Absorption in Circumscribed Topics.

AS is characterized by restricted, repetitive, and stereotyped patterns of behavior, interests, and activities, as manifested by at least one of the following: 1) encompassing preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus, 2) apparently inflexible adherence to specific nonfunctional routines or rituals, 3) stereotyped and repetitive motor mannerisms, and 4) persistent preoccupation with parts of objects.[54] Repetitive behavior and restricted interests appear to be the most frequently observed clinical symptoms of AS.[55] The AS individual develops unusual interests in topics "such as the weather, facts about TV stations, [or] railway tables or maps, which are learned in rote fashion and reflect poor understanding, conveying the impression of eccentricity."[56] The interests and corresponding behavior are remarkable "in the sense that often times extraordinary amounts of factual information are learned about very circumscribed topics (e.g., snakes, names of stars, maps, TV guides, or railway schedules)."[57] "[I]ndividuals with AS may collect volumes of detailed information on a relatively narrow topic such as dinosaurs or deep fat fryers . . . without necessarily having genuine understanding of the broader topic."[58]  For instance, an AS individual might obsessively memorize and collect camera model numbers without caring much about photography.

AS individuals tend to throw themselves headlong into the circumscribed interests and become utterly obsessed with their new pastime.[59] Although teens with AS may share interests with other non-disordered teens, like computers or video games, they pursue them to the

---

[54] DSM-IV-TR definition of AS.
[55] Individuals with AS usually engage in repetitive, almost obsessive, patterns of behavior to pursue their all-absorbing interests. Klin, McPartland, and Volkmar, *supra*, at 100.
[56] *Id*.
[57] *Id*.
[58] McPartland and Klin, *supra*.
[59] Some have described such obsessive absorption as "tunnel vision." *People v. Macklem*, 149 Cal. App. 4th 674, 680 (Cal. Ct. App.2007).

exclusion of almost everything else. Many parents report that their child will stay at the computer for hours pursuing such interests, not breaking to go to the toilet, to eat, or to sleep unless pressured, and even then with much resistance.

The intensity with which the AS pursues his interests often alienates him from his peers. So, too, does his choice of interests. Unlike neurotypical teens, teens with AS obsess over matters as odd and varied as the intricacies of the stock market, the seven deadly sins, sprinkler systems, or botanical classifications.

### 5. Clumsy and Ill-Coordinated Movements and Odd Posture

Delayed or impaired motor skills are another associated, albeit not required, feature of an AS diagnosis.[60] AS individuals often have a "delayed acquisition of motor skills such as pedaling a bike, catching a ball, or opening jars."[61] They tend to be visibly awkward, exhibiting rigid gait patterns, odd posture, poor manipulative skills, and significant deficits in visual-motor coordination.[62]

### 6. No Clinically Significant Delay in Cognitive Development or In the Development of Age-Appropriate Self-Help Skills, Adaptive Behavior (Other Than in Social Interaction), And Curiosity About the Environment in Childhood.

Despite problems with social interaction and communicative deficits, AS individuals have normal or above-normal intelligence[63] and the ability – to differing degrees – to feed or dress themselves and take care of their daily needs.[64] To the uninformed individual, an AS individual's intelligence and high-functioning capabilities often mask their neurodevelopmental disorder. Of course, this is the engine of misunderstanding. The observer presumes that with normal intelligence comes normal maturity and normal appreciation of social and legal

---

[60] Klin, McPartland, and Volkmar, *supra*, at 100.
[61] *Id*.
[62] *Id*.
[63] *Id*.
[64] GALE ENCYCLOPEDIA OF NEUROLOGICAL DISORDERS, *supra*.

conventions — that by engaging in any conduct they have the intent and purpose that "normal" people have when they engage in that conduct.

The reader with experience in the criminal justice system will already have understood how the AS individual can end up in contact with law enforcement. A person with AS will sometimes engage in what can be objectively viewed as anti-social behavior, yet without any subjective understanding or appreciation whatsoever of its inherent impropriety, let alone criminality. The features of AS combine to create a risk of engaging in behavior offensive toward others but with no offensive purpose.[65] The inability to associate actions with their results and "to assess social situations and appreciate others' point of view,' constitute the main cause for" criminal accusations against AS individuals.[66]

Thus, confrontations with the criminal justice system on the part of AS adolescents and young adults are usually the result of the misunderstanding of societal norms, as well as the misinterpretation of the behavior of the AS individual by others, and not the product of a criminal mind-set. "What appears as anti-social behavior" involving criminal or malicious intent "to the 'regular' world, is often simply the manifestation of the ASD person's social misunderstandings."[67]

**Counterfeit Deviance**

An extremely useful way to conceptualize this phenomenon is in the terms "counterfeit deviance." First used by Hingsburger, Griffiths, and Quinsey in 1991,[68] counterfeit deviance

---

[65] "Deficient social awareness of salient interpersonal and social constraints on behavior" coupled with the AS individual's inability to appreciate others' feelings and nonverbal social cues may result in apparently criminal acts. Haskins and Silva, *supra*, at 374.

[66] Katz and Zemishalny, *supra*, at 166. The AS adolescent's or adult's deficit in abstract thought limits the "ability to properly assess the consequences of her or his actions or comprehend and be governed by criminal law concepts and prohibitions." Mayes, *supra*, at 93.

[67] Debbaudt, Dennis, "Beyond Guilt or Innocence." ahaNY.org (available at, http://www.ahany.org/Debbaudt.htm, last accessed 7/10/08).

[68] Hingsburger, D., D. Griffiths, and V. Quinsey. "Detecting Counterfeit Deviance:

occurs when an individual engages in behavior that "topographically look[s] like a Paraphilia but lack[s] the recurrence of and the pathological use of sexual fantasies, urges, or behavior."[69] Instead the behavior is explained by "experiential, environmental, or medical factors rather than of a Paraphilia."[70] The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders Text Revision (DSM-IV) acknowledges that in certain individuals "there may be a decrease in judgment, social skills, or impulse control that, in rare instances, leads to unusual sexual behavior" that is distinguishable from Paraphilia and considered a differential diagnosis. However, the DSM-IV does not officially adopt any name for this differential diagnosis.[71]

Under the Diagnostic Manual-Intellectual Disability, which is also published by the American Psychiatric Association, like the DSM-V, but in conjunction with the National Association for the Dually Diagnosed, "counterfeit deviance" is a differential diagnosis for Paraphilia. This differential diagnosis must be "based on an evaluation of the individual's environment, sociosexual knowledge and attitudes, learning experiences, partner selection, courtship skills, and biomedical influences."[72] Individuals with an intellectual disability who are alleged to have committed sexual offenses may engage in unusual sexual behavior due to challenges in judgment, social skills, or impulse control, which is diagnostically different than Paraphilia.[73] "Such misbehavior can result from a lack of privacy (structural), modeling,

---

Differentiating Sexual Deviance from Sexual inappropriateness." The Habilitative Mental Healthcare Newsletter. 10 (1991): 51-54.
[69] Dorothy Griffiths et al., Sexual and Gender Identity Disorders, in DIAGNOSTIC MANUAL INTELLECTUAL DISABILITY: A TEXTBOOK OF DIAGNOSIS OF MENTAL DISORDERS IN PERSONS WITH INTELLECTUAL DISABILITY 424, 427 (2007) [hereinafter DM-ID].
[70] *Id*.
[71] DSM-IV-TR. Washington, D.C.: American Psychiatric Association, 2000. At 568.
[72] *Id*.
[73] Griffiths et al., *supra*, at 427.

inappropriate partner selection or courtship, lack of sexual knowledge or moral training, a maladaptive learning history, or medical or medication effects."[74]

While AS is not categorized as an Intellectual Disability ("ID") because of the usual presence of average to high intelligence, there is significant overlap between those with ID and AS, including similar deficits in adaptive functions and socialization skills. For example, when compared to neuro-typical individuals, those with ID exhibit a "lack of sociosexual skills and knowledge, decreased opportunities for sociosexual behavior, sexual victimization, difficulties projecting consequences, and difficulties recognizing and expressing emotions."[75] The same is true of individuals with AS, who are more likely to be victims than victimizers, and who also have difficulty understanding the social cues and emotions that are all around them.[76] This overlap makes the concept of counterfeit deviance equally applicable to both ID and AS because the person's IQ has no real bearing on this adaptive deficit.  Dorothy Griffiths, Ph.D., is one of the originators of the concept of counterfeit deviance and an expert in the field of developmental disabilities and sexual abuse or offenses. She is an Associate Dean for the Faculty of Social Sciences at Brock University in St. Catharines, Ontario, and has treated individuals with AS accused of sexual offenses. Counterfeit deviance is a differential diagnosis for individuals with AS who are accused of deviant behavior and sexual offenses.

Dr. Denise C. Kellaher, a Forensic Psychiatrist who does a great deal of work in the California prison system in addition to her private practice and research, much of it centering on Asperger's, published an article entitled Sexual Behavior and Autism Spectrum Disorders: An Update and Discussion, in CURRENT PSYCHIATRY REPORTS, 2015:17:25 where she directly applied the concept to AS:

---

[74] *Id.*
[75] *Id.* at 428.
[76] Klin, Ami et al., *supra* at 899; Mesibov et al., *supra*, at 10.

**Counterfeit Deviance**

> In the ASD population, deviant sexual behavior could stem from a paraphilia or it may represent "counterfeit" deviant sexual behavior. Counterfeit deviance characterizes sexual behavior that may appear to arise from a paraphilia but instead it originates from a lack of sexual knowledge and experience and from poor social skills.[77]

Counterfeit deviance looks at what is causing the behavior that superficially appears deviant. It is necessary to look at the way in which individuals process the world and what the intention was behind the apparently deviant actions. Individuals with AS exhibit many of the same factors that influence sexual conduct in individuals with ID. Therefore, when an individual with AS is accused of deviance or a sexual offense, a careful assessment must be conducted to determine if a paraphilia is indeed present,[78] or if the differential diagnosis of counterfeit deviance applies.

**Asperger's Syndrome is Not Associated With Sexual Perversion**

There is nothing inherent in ASD or AS to make individuals likely to develop sexual fantasies of one kind or another or to make individuals inclined to sexual deviance of any kind. Their offbeat behavior and inappropriately frank speech, especially relating to romantic or sexual matters, sometimes leads to the perception that persons with AS are hyper-sexual. Though "persons with ASD are sexual beings, [their] individual interest in sex or in developing an intimate sexual relationship with another person varies widely across individuals at all ability levels."[79]

Thus, AS is not a predictor of pedophilia or any other paraphilia. Rather, the syndrome is a neuro-developmental disorder (brain disorder of early onset) impacting a person's ability to meet the demands of everyday life, including having "street smarts." As a consequence, those

---

[77] [fn 52 in original] Hingsburger D, Griffiths D, Quinsey, V., "Detecting counterfeit deviance: differentiating sexual deviance from sexual inappropriateness." Habilitative Mental Health Newsletter. 1991:51–54.
[78] See Griffiths et al., *supra*, at 427.
[79] Gerhardt, Peter F., "Sexuality & Sexuality Instruction with Learners with Autism Spectrum Disorders and Other Developmental Disabilities." THE ORGANIZATION FOR AUTISM RESEARCH, at 3.

with AS are much more likely to be victims rather than victimizers,[80] although their behavior may give the impression of the latter for those who do not know them or their disability.

Even if an AS individual was erotically interested in "underage" females, he is very unlikely to be involved in any actual offense against a child. First, as expert witness and psychiatrist Dr. Kleinmann claims, "having this disorder actually makes improper sexual behavior less likely because individuals with Asperger's Disorder are not charismatic and are perceived, even by children, as different and bizarre," and thus, unlikely to entice children even if so inclined. *State v. Burr*, 921 A.2d 1135, 1142 (N.J. 2008).

### AS and Sexuality

Concerning issues of sexual sophistication and behavior, what might appear to be extremely inappropriate conduct to the uninformed observer, remains–at least before it is explained to be otherwise–wholly appropriate to the AS individual. Researchers have found that AS teens, typically delayed to at least half their chronological age in their sexual and social-emotional maturity but right on schedule with puberty, often engage in behavior perceived to be inappropriate (such as touching others, touching their own private body parts in public, and publicly talking about sex in ways that are inappropriate compared to the ways their peers talk about sex) because of their social skills deficit.[81] AS and hfASD experts suggest parents:

> not just broach the subject of sexuality with your child but also to revisit it periodically to ensure that your child thoroughly comprehends the social rules surrounding sexuality . . . . In a worst case scenario, misunderstandings in this area could lead to individuals with AS-HFA becoming either unwitting sexual offenders or vulnerable to sexual victimization.[82]

---

[80] Examples of cases where the AS individual was a victim include *People v. Abercrombie*, 161 Cal. App. 4th 68 (Cal. Ct. App. 2008); *People v. Walker*, 2005 WL 2143952 (Cal. Ct. App. 2005); *State v. D.M.*, 958 So. 2d 77 (La. Ct. App. 2007); *In re Santini*, 2008 WL 2068288 (Mich. Ct. App. 2008); *State v. Brown*, 2008 WL 2587050 (Ohio Ct. App. 2008); and *State v. Hofmann*, 2004 WL 2848938 (Ohio Ct. App. 2004).

[81] Ashley, Susan, The Asperger's Answer Book: The Top 300 Questions Parents Ask, at 257. (Illinois: Sourcebooks, 2007)

[82] Mesibov et al., *supra*, at 225.

What gets AS young adults into legal trouble is not abnormal sexual desires, but their tendency to express or pursue normal interests in a manner outside social conventions. In fact, once social and legal rules governing sexual conduct and interests are explicitly explained to the individual with AS, this problem is generally solved. This is the reason why many clinicians and advocacy groups conduct sexual education and socialization training.[83] While observing social norms does not come intuitively, they can learn this as well, with appropriate cognitive behavioral therapy.

### AS and Pornography

AS individuals desire intimate relationships and friendships, "yet they lack the appropriate skills and knowledge to initiate such relationships successfully."[84] With no friends and largely misunderstood by others, this is a population that often turns to and, indeed, withdraws into the computer as an ostensibly safe refuge. The internet has enabled people with AS to engage in social interaction via email, discussion groups, or through web pages.[85]AS individuals tend to have the technical skills for computer use, to which they gravitate because computers are predictable, logical, and syntax-guided, unlike social interactions, which are unpredictable, whimsical, and semantic-guided. People with AS indicate that the internet allows them the "opportunity to meet like-minded individuals who accept the person because of their knowledge rather than their social persona" and

> that they often have a greater eloquence to disclose and express their inner self and feelings through typing rather than conversation. In social gatherings, the person is expected to be able to listen to and process the other person's speech (often against a background of other conversations), to immediately reply, and simultaneously analyze non-verbal cues, such as gestures, facial expression,

---

[83] Debbaudt, *supra*.
[84] Stokes, Mark and Naomi Newton and Archana Kaur, "Stalking, and Social Romantic Functioning Among Adolescents with Autism Spectrum Disorder." 37 J AUTISM DEV DISORD 169 (2007), at 1969.
[85] Tantam, *supra*, at 147.

and tone of voice. When using the computer, the person can concentrate on social exchange using a visual rather than auditory medium.[86]

**Asperger's Syndrome and Child Pornography**

Exploration of the online world of pornography inevitably leads some AS individuals to exposure to child pornography. Often, they are victims of predators who befriend them in chat rooms about computer games. Where the line between pornography and child pornography demarcates a transgression against societal mores and criminal laws for the non-Asperger individual, who experiences "red flags," for the AS individual, such is not the case.

**AS individuals' inability to intuit social mores and legal rules**

The internet and AS users can often result in a "lethal combination." The AS individual "has a tremendous amount of technical skills in regards . . . to technological things such as computers combined with an immense naivete about culture, about the impact of one's behavior and about cultural values that are basically available to all who absorb those quite effortlessly and yet those are things that are often implicit," and the internet is replete with web sites that are "created in order to embrace, engulf, involve others particularly those that are naive."[87] The internet can be especially dangerous for those with AS because they lack the sense of "too good to be true offers" and do not have "a clue as to the implications of what [they are] doing and about the cultural value assigned to images that [they are] seeing." Moreover, while non-disordered individuals easily intuit that an image implies or depicts the victimization of a child onscreen, "a young man whose idea about other people's intentions, about other people's beliefs, about people's motivations; a young man for whom all those concepts that we take for granted are just not there" faces a tremendous amount of difficulty in implementing such senses on the

---

[86] Attwood, Tony, "Frameworks for Behavioral Interventions." 12 CHILD ADOLESC PSYCHIATRIC CLIN N AM 65 (2003), at 72.
[87] *Connecticut v. Casciato*, FBT-CR-08-2308568 (Superior Ct. 2008).

internet. Having the technical skills yet not having the sophistication to understand what they are doing is a "terrible combination" for AS internet users.[88]

**Empathetic deficits**

A crucial premise in forces behind prosecuting child pornography cases is that the person viewing such images understands that the depicted children are being exploited, and psychologically and physically harmed, and are not capable of consenting to what is being depicted. In many of these child pornography images the children appear upset or anxious. While neurotypical individuals would normally easily be attuned to such nonverbal expressions of discomfort, the AS teen or adult lacks the empathic capacity or the "theory of mind" required to do so. The AS individual does not make the connections between 1) the apparent age of depicted persons and legal rules, such as inability to consent or rules about "underage" images, or 2) the methods of creation of child pornography and the abuse of children involved. People with AS have difficulty with the concept of consent because it entails exactly that which Asperger's individuals are incapable of doing – evaluating and processing the nonverbal cues of other individuals. It is no surprise, then, that AS individuals fail to recognize the abused children's anguish or anxiety; after all, experts suggest AS individuals must be taught, first, to recognize others' non-verbal cues, second, the definition of consent, and finally, that consent is a necessary precursor to socially acceptable sexual encounters.[89]

**AS individuals are not dangerous**

The tragedy for AS individuals and their families lies in the misinterpretation of their conduct. While it might objectively appear offensive or dangerous, this does not correlate with any criminal mindset, as we have demonstrated. But the tendency is to treat persons as "odd" as

---

[88] *Id*. at page 29, lines 9-10.
[89] Gerhardt, *supra*.

dangerous is pervasive. And, over the years, there have been highly publicized cases of extreme violence in which the actor had "Asperger-like features" or an actual ASD diagnosis There has never been any evidence that individuals with ASD are prone to violence, and the available data shows that this is not the case.[90]   They are not more likely to be dangerous or deviant, but, because of their naïveté, failure to perceive the feelings of others, ignorance of social norms, and lack of "common sense," may well engage in behavior that appears violent or deviant, but perceive no "red flags" that the behavior is inappropriate. Eventually it has been recognized, first, that statistics on the rate of incarceration of those with ASD are somewhat misleading, because, as described herein, we cannot really be confident that the statistics tell us much about dangerousness, because many people with ASD are convicted merely because they engaged in forbidden conduct, but without any criminal intent or purpose.

### Prison Experiences of ASD Individuals

The incarceration of individuals with ASD invariably worsens their already highly vulnerable mental and emotional states. For these men, bullying is to be expected in general society; in prison, it is inevitable.[91] Prison presents a host of challenges to any inmate. An ASD individual's obsessive, compulsive personality, which is burdened by wholly deficient social skills and understanding, is especially ill-adapted to the cutthroat, Darwinian lifestyle of prison. For example, rigid reliance on formalistic rules, which often provide guidance for these men in

---

[90] Alexander Westphal, Public Perception, Autism, and the Importance of Violence  Subtypes, JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY, Vol. 56,  Issue 6 (June 2017) (Abstract at http://dx.doi.org/10.1016/j.jaac.2017.03.020 ); Heeramun, R.,  Magnusson, C., Gumpert, C.H. et al, Autism and convictions for violent crimes: population-based cohort  study in Sweden. J AM ACAD CHILD ADOLESC PSYCHIATRY, Vol. 56:491–497 (2017); Clare Allely,  (2015),"Experiences of prison inmates with autism spectrum disorders and the knowledge and  understanding of the spectrum amongst prison staff: a review," JOURNAL OF INTELLECTUAL   DISABILITIES   AND   OFFENDING   BEHAVIOUR,   Vol.  6   Iss  2   pp.   55   -   67. http://dx.doi.org/10.1108/JIDOB-06-2015-0014

[91] Though statistics vary, reported instances of bullying among ASD individuals in the general population ranges from 29% to 94%. Lawrence A. Dubin *et al*., CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM: AUTISM, OTHER DEVELOPMENTAL DISABILITIES, AND NON-CONTACT SEX OFFENSES, P. 49 (2017). This statistic is an even greater cause for concern given the fact that ASD individuals report victimization more frequently than their neurotypical peers. *Id.*

otherwise uncomfortable situations, compel ASD inmate to "snitch" on fellow inmates for rule violations.[92] As such, these disclosures unfortunately precipitate a greater degree of "bullying, exploitation, social isolation, and altercations with other inmates."[93]

Imprisoned ASD individuals are at an even greater risk of physical and sexual victimization than their neurotypical peers.[94]  This abuse is only exacerbated by the fact that prison staff fail to understand, cater to, or empathize with these men.[95] If the penological goals of incarceration truly account for deterrence and rehabilitation, these objectives are not served when incarcerating ASD individuals. There is no conduct to deter or rehabilitate when these men, at the outset, are cognitively unaware of the wrongfulness of their actions.[96]  They require "habilitation," not rehabilitation.[97]  This failure by prison staff to not only prevent physical and mental abuse, but also provide appropriate habilitative education hinders any meaningful attempt for these men to reenter society a more morally and criminally responsible individual.[98]

This issue was explored in great detail in the *Smith* case with Judge Ellis, referenced above.  In that case, Judge Ellis took pains to ensure the autistic defendant would be placed in an environment (the SKILLS program) where he would be safe.  In an exchange with the probation officer, the Court noted the following:

Court: And I want to -- I believe she used a term in describing Mr. Smith?

---

[92] See generally Simon Baron Cohen, Mindblindness: An Essay on Autism and Theory of Mind (1995).

[93] Clare S. Allely, Autism Spectrum Disorders in the Criminal Justice System: Police Interviewing, the Courtroom, and the Prison Environment, SMGroup, Oct. 2015, 7.

[94] *Id*. at 8.

[95] *Id*.

[96]  Kimberly Taylor et al., Asperger Syndrome in the Criminal Justice System, Asperger/Autism Network, 2009, 3, http://www.aane.org/asperger-syndrome-criminal-justice-system/  ("people with AS often get into trouble without even realizing they have committed an offense").

[97]  Dorothy Griffiths & J. Paul Fedoroff, Persons with Intellectual Disabilities Who Sexually Offend, in Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues 353, 367 ("Habilitation involves an active education and training component within a strong habilitatively supportive environment to set up the conditions by which the individual can assume, perhaps for the first time a sense of dignity and responsibility with regard to one's sexuality.").

[98] *Id*.

A. She described him -- I recall -- I recall she and I having a phone conversation after she did her evaluation where she said that he appeared very child-like. And I had told her that that was my impression as well.

Q. Now, as you recall one of my chief concerns is whether Mr. Smith, how he would fair in a general prison population. Did Dr. Rohrer express a view about that?

A. Yes, Your Honor. If I recall correctly, she testified that she felt that there was a very high risk of him being taken advantage of.

A. Yes, you did.

Q. All right, so, now from Dr. Rohrer and others we learned about a program. Can you tell us about that? A program that might be suitable for Mr. Smith?

A. The Bureau of Prisons has a program called the "Skills Program" that is designed for inmates with brain development disorders.

Q. Not just autism?

A. Not just autism. Various brain development disorders. They have two facilities in the country that have that program. One is in Massachusetts and one is in Florida.

Q. And can you give a rough thumbnail sketch of these programs? They're called "skills" because they teach the individual skills, is that right?

A. That's correct. The skills program -- it's called the Skills Program. I can't find my sheet on the skills program that I was just reading about five minutes ago because of all of these documents. Sorry I keep flipping through things but it is hard to keep track. Here it is. So the skills program, it says from the Bureau of Prisons's website directly to quote: "That it is a residential treatment program designed to improve the institutional adjustment of inmates with intellectual disabilities and social deficiencies. It uses an integrative model which includes modified therapeutic community, cognitive, behavioral therapy and skills training. The goal of the program is to increase academic achievement and adaptive behavior of cognitively impaired inmates. It lasts 12 to 18 months. It is voluntary. And individuals who complete it are able to stay there after a completion and work as mentors for newer people coming in."

Q. Now, importantly, are individuals in the skills program exposed to the general population?

A. No, they're not. They're housed separately the entire time they are on that program.

Q. So it's a separate community?

A. Correct.[99]

For these reasons, we would request in this case, as in the case cited above, that the Court make a recommendation that BOP put the defendant in the SKILLS program where he will be safe.

---

[99] *See* Exhibit C

### III.      Conclusion

For the foregoing reasons, the defendant respectfully requests the Court impose a sentence of 60 months, with three further recommendations: 1. That the defendant be committed to FCI Danbury, 2. That he be evaluated for participation in the SKILLS program at that facility, and 3. That he participate in the RDAP program at that facility.

Respectfully Submitted,

  /s/ John Zwerling_____
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2019 a copy of the foregoing was filed by ECF, which shall serve notice upon all parties, except for sealed Exhibit which have been served by email on opposing counsel and the Probation Office.

  /s/ John Zwerling_____
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com